# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 7, 2015

Lyle W. Cayce
Clerk

No. 14-10049

_____

CHRISTOPHER L. CRANE; DAVID A. ENGLE; ANASTASIA MARIE
CARROLL; RICARDO DIAZ; LORENZO GARZA; FELIX LUCIANO; TRE
REBSTOCK; FERNANDO SILVA; SAMUEL MARTIN; JAMES D.
DOEBLER; STATE OF MISSISSIPPI, by and through Governor Phil Bryant,

                    Plaintiffs - Appellants Cross-Appellees

v.

JEH CHARLES JOHNSON, SECRETARY, DEPARTMENT OF
HOMELAND SECURITY; JOHN SANDWEG, in His Official Capacity as
Director of Immigration and Customs Enforcement; LORI SCIALABBA, in
Her Official Capacity as Acting Director of United States Citizenship and
Immigration Services,

                    Defendants - Appellees Cross-Appellants

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before KING, DAVIS, and OWEN, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

      Plaintiffs-Appellants are several Immigration and Customs
Enforcement agents and deportation officers (collectively referred to as
"Agents") and the State of Mississippi. They filed this suit against the
Secretary of the Department of Homeland Security and the directors of
departments within that agency (collectively referred to as "DHS"), in their
official capacities, challenging DHS's 2012 directive, which requires its officials

No. 14-10049

to use "deferred action" as to a certain class of aliens in immigration removal proceedings. The Agents allege that exercising deferred action violates federal law, because the law requires them to detain all illegal aliens for the purpose of placing the aliens in removal proceedings. The State of Mississippi alleges that the deferred action has caused additional aliens to remain in the state and, thus, causes the state to spend money on providing social services. The district court dismissed Plaintiffs' claims for lack of subject matter jurisdiction. We conclude that neither the Agents nor the State of Mississippi has demonstrated the concrete and particularized injury required to give them standing to maintain this suit. We therefore affirm the district court's judgment.

## I. BACKGROUND

### A. Enforcement of Immigration Laws

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."[1] The Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1101 *et seq.*, is the comprehensive statutory scheme governing immigration in the United States. It controls, among other things, the removal of illegal aliens found within the United States.[2] Those "[a]liens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."[3]

Under the INA, the Secretary of the Department of Homeland Security is "charged with the administration and enforcement of [the INA] and all other

---

[1] *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012) (citations omitted).

[2] 8 U.S.C. § 1227.

[3] *Arizona,* 132 S. Ct. at 2499.

2

No. 14-10049

laws relating to the immigration and naturalization of aliens . . . ."[4] Although the Secretary of DHS is charged with enforcement of the INA, "a principal feature of the removal system is the broad discretion exercised by immigration officials."[5] In fact, the Supreme Court has recognized that the concerns justifying criminal prosecutorial discretion are "greatly magnified in the deportation context."[6]

## B. Challenged Executive Immigration Enforcement Programs

Beginning in 2012, the Executive Branch implemented a program deferring action against the removal of what it considers low priority aliens. This class of low priority aliens are "certain young people who were brought to [the U.S.] as children and know only this country as home."[7] This is known as the Deferred Action for Childhood Arrivals ("DACA") program outlined in former DHS Secretary Napolitano's directive, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" ("Napolitano Directive" or "the Directive").[8]  As outlined in the Napolitano Directive, DACA permits, on a case-by-case basis, deferred action

---

[4] 8 U.S.C. § 1103(a)(1).

[5] *Arizona*, 132 S. Ct. at 2499.

[6] *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. . . . These concerns are greatly magnified in the deportation context.") (internal quotation marks omitted).

[7] *See* Memorandum from Janet Napolitano, Secretary, Department of Homeland Security, to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) ("Napolitano Directive"), at 1, *available at* http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[8] *Id.*

No. 14-10049

on the removal of undocumented aliens who: (1) arrived in the United States before the age of sixteen; (2) are under the age of 31 as of June 15, 2012; (3) have continuously resided in the United States since June 15, 2007; (4) are in school, have graduated from high school, have obtained a general education development certificate, or have been honorably discharged from the Coast Guard or Armed Forces of the United States; and (5) have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety.[9]  If an alien satisfies all of these criteria, then the alien may apply to have any removal proceeding deferred for a period of two years.[10]  The alien must pass a criminal background check, submit biometrics, file several forms, and pay a fee.[11]  Deferred action is granted on a case-by-case basis and DHS does not guarantee that relief will be granted in all cases.[12]

---

[9] *Id.* at 1-2.

[10] *Id.* at 2.

[11] *Id.; See also Consideration of Deferred Action for Childhood Arrivals (DACA),* uscis.gov, http://www.uscis.gov/childhoodarrivals (last visited February 19, 2015).

[12] Napolitano Directive at 2.  In 2014 — after the initiation of this lawsuit — acting Secretary of DHS, Jeh Johnson, issued a supplemental directive amending DACA and instituting a new program granting deferred action to another class of undocumented aliens. The new program defers action against parents of U.S. citizens or lawful permanent residents that meet similar criteria found in DACA.  This new program has become known as "DAPA," Deferred Action for Parent Arrivals.  Plaintiffs do not challenge DAPA's validity.  Therefore, we need not, and do not, discuss DAPA.  The 2014 DACA amendments removed the age cap of 31 as of June 15, 2012, extended the period of deferred action to three years instead of two, and adjusted the date from which the alien must be continuously residing in the United States from June 15, 2007 to January 1, 2010.  The 2014 DACA amendments are not the subject of Plaintiffs' challenges. *See* Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, to Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents* (November 20, 2014) ("Johnson Directive"), at 5, *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf.

No. 14-10049

According to Section 1225 of the INA, when an immigration officer encounters an alien who is an "applicant for admission," the officer must determine whether the alien is "clearly and beyond a doubt entitled to be admitted."[13]   An "applicant for admission" includes aliens present in the United States who have not been admitted.[14]   If the examining immigration official is not satisfied that the alien is entitled to be admitted, then the officer "shall" detain the alien for a removal proceeding.[15]   It is undisputed that Section 1225(b)(2)(A) only directs the Agents to detain an alien for the purpose of placing that alien in removal proceedings.   It does not limit the authority of DHS to determine whether to pursue the removal of the immigrant.

DACA instructs DHS officials who come into contact with an undocumented alien who meets the program's criteria to "immediately exercise" prosecutorial discretion, on an individual basis, in order to uphold DHS's priority removal scheme.[16]   Once DHS awards the alien deferred action, the alien may apply for work authorization during the time period action is deferred.[17]

---

[13] 8 U.S.C. § 1225(b)(2)(A).

[14] *Id.* at § 1225(a)(1).

[15] *Id.* at § 1225(b)(2)(A).

[16] *See* Napolitano Directive at 2, which states, in pertinent part:

  1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

  • With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

[17] *Id.* at 3.

No. 14-10049

According to the Agents, even if the immigration official is not satisfied that the alien is "clearly and beyond a doubt entitled to be admitted," DACA prohibits the agent from detaining eligible aliens for the purpose of commencing removal proceedings.  The Agents read 8 U.S.C. § 1225(b)(2)(A) as requiring them to detain all undocumented immigrants they come in contact with.  They contend that if they follow the statute and decline to follow DACA they will be subject to employment sanctions.  The Agents also allege that following DACA will cause them to violate their oath to support and defend the laws of the United States.

The State of Mississippi alleges that the beneficiaries of DACA who remain in the state will cost the state money in education, healthcare, law enforcement, and lost tax revenue.  In support of this allegation, Mississippi points to a 2006 study conducted by Mississippi officials that estimates the net fiscal burden of illegal immigration as a whole at $25 million per year.

## C.  Procedural Posture

According to Plaintiffs' amended complaint, DHS began accepting DACA applications on August 15, 2012.  Plaintiffs filed this lawsuit seeking declaratory and injunctive relief eight days later, on August 23, 2012, facially attacking the constitutional and statutory validity of the DACA program.  Specifically, Plaintiffs allege that the program violates:

> (1) federal statutes requiring the initiation of removals; (2) federal law by conferring a non-statutory form of benefit—deferred action—to more than 1.7 million aliens, rather than a form of relief or benefit that federal law permits on such a large scale; (3) federal law by conferring the legal benefit of employment authorization without any statutory basis and under the false pretense of "prosecutorial discretion"; (4) the constitutional allocation of legislative power to Congress; (5) the Article II, Section 3, constitutional obligation of the executive to take care that the laws

No. 14-10049

are faithfully executed; and (6) the Administrative Procedure Act
through conferral of a benefit without regulatory implementation.

All of the causes of action, except the third, challenge the portion of DACA that requires the Agents to exercise prosecutorial discretion and refrain from detaining certain aliens. The third cause of action challenges the employment authorization provision of DACA.

Defendants filed a Fed. R. Civ. P. 12(b)(1) Motion to Dismiss, asserting, among other things, that Plaintiffs lack standing to challenge the provisions of DACA. Specifically, Defendants claim that Plaintiffs have not alleged an adequate injury-in-fact that can be redressed by a favorable ruling. In opposition to the Motion to Dismiss, the Agents asserted three distinct injuries: (1) a violation of their oaths of office; (2) the burden of compliance with the Directive; and (3) "being compelled to violate a federal statute . . ., on pain of adverse employment action if they do not." The district court found that violating one's oath is not a sufficient injury-in-fact to confer standing, nor is the burden of complying with the Directive. However, the district court found that the threat of an adverse employment action if the Agents refuse to follow the Directive is a sufficient injury to support standing. The court dismissed the Agents' third cause of action, challenging the employment authorization provisions of DACA for lack of subject matter jurisdiction, because the Agents' injury does not relate to that DACA provision. Plaintiffs do not challenge this dismissal on appeal. The Agents' remaining causes of action, however, were allowed to proceed.

Mississippi asserted that the cost to the state in providing support services to DACA beneficiaries is an adequate injury to support standing. The district court held that Mississippi's allegation of a fiscal burden was too speculative because the only support the state provided for this burden was a 2006 report which estimated the annual cost of immigration six years before

7

No. 14-10049

the DACA program was instituted. Mississippi produced no studies or other evidence tending to establish that the DACA program would add to the state's already existing costs.

Next, the district court proceeded with the Agents' remaining claims and conducted an evidentiary hearing on their petition for a preliminary injunction. The court did not rule on the preliminary injunction because an outstanding jurisdictional question existed as to whether the Agents had exhausted their administrative remedies before proceeding to federal court. Ultimately, the district court determined that the Agents had not pursued their remedies under the Civil Service Reform Act, and, thus, the district court lacked subject matter jurisdiction over these claims. The court dismissed the remainder of the Agents' claims. This appeal followed.

## II.  STANDARD OF REVIEW

We review a district court's grant of a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction de novo.[18] Moreover, the jurisdictional issue of standing is a legal question for which review is de novo.[19] In determining whether the court has subject matter jurisdiction, we must accept as true the allegations set forth in the complaint.[20] The court is also "empowered to consider matters of fact which may be in dispute."[21] Therefore, a trial court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented

---

[18] *Choice Inc. v. Greenstein,* 691 F.3d 710, 714 (5th Cir. 2012).

[19] *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102 (1998).

[20] *Choice Inc.,* 691 F.3d at 714.

[21] *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) (citing *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir. 1981)).

No. 14-10049

by undisputed facts plus the court's resolution of disputed facts."[22] "The party invoking federal jurisdiction bears the burden of establishing standing."[23]

## III. LAW AND ANALYSIS

We must first consider the threshold question of jurisdiction. Article III of the United States Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies."[24] The doctrine of standing provides definition to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process."[25] "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."[26] "In keeping with the purpose of this doctrine, '[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."[27]

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"[28]

---

[22] *Wolcott v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) (citing *Ramming*, 281 F.3d at 161) (citations omitted).

[23] *Choice Inc.,* 691 F.3d at 714 (quoting *Williamson*, 645 F.2d at 413).

[24] U.S. CONST., art. III, § 2.

[25] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[26] *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013).

[27] *Id.* at 1147 (alteration in original).

[28] *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan*, 504 U.S. at 560-61 (internal quotation marks omitted)) (alteration in original).

No. 14-10049

"An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[29] "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is certainly impending."[30] "Thus, we have repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."[31]

## A. Mississippi's Standing

Plaintiffs-Appellants first challenge the district court's determination that Mississippi's alleged injury in fact is too speculative to support standing. Specifically, Mississippi argues that its fiscal injury is already manifest because a 2006 study shows that the illegal aliens of Mississippi cost the state more than $25 million per year. Since DACA authorizes a certain class of those illegal aliens to remain in the state, Mississippi argues that the program necessarily costs the state money.

In response, DHS asserts two arguments. First, that Mississippi has failed to allege facts showing that the cost to the state will increase as a result of DACA. All that Mississippi can point to, according to DHS, is that *illegal immigration* is costing the state money, not that *DACA* is costing the state money. It could be that the reallocation of DHS's assets is resulting in the removal of immigrants that impose a greater financial burden on the state. If this is true, the net effect would be a reduction in the fiscal burden on the state.

---

[29] *Susan B. Anthony List,* 134 S. Ct. at 2341 (quoting *Lujan*, 504 U.S. at 560).

[30] *Clapper,* 133 S. Ct. at 1147 (citing *Lujan*, 504 U.S. at 565, n. 2 (internal quotation marks omitted)).

[31] *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotation marks omitted)) (emphasis in original). *See also Lujan*, 504 U.S. at 565 n. 2.

No. 14-10049

Second, DHS argues that a favorable ruling would not necessarily redress Mississippi's alleged injury. It is uncontested that 8 U.S.C. § 1225(b)(2)(A) — if read as Plaintiffs claim — only compels the commencement of removal proceedings. DHS argues that even if we were to read the statute that way, DHS unquestionably has the discretion to terminate removal proceedings after their initiation and release the immigrant back into Mississippi.

The district court held that Mississippi's alleged fiscal injury was purely speculative because there was no concrete evidence that Mississippi's costs had increased or will increase as a result of DACA. Based on the record before the district court[32], we agree. Mississippi submitted no evidence that any DACA eligible immigrants resided in the state. Nor did Mississippi produce evidence of costs it would incur if some DACA-approved immigrants came to the state. Instead, Mississippi only asserts (based on the 2006 study) that DACA will cost the state money because the state provides social benefits to illegal immigrants. Article III standing, however, mandates that Mississippi show a "concrete and particularized" injury that is "fairly traceable" to DACA. To do that, Mississippi was required to demonstrate that the state will incur costs because of the DACA program.[33] Because Mississippi's claim of injury is not supported by any facts, we agree with the district court that Mississippi's injury is purely speculative. Mississippi has failed to carry its burden to

---

[32] Mississippi has referred to additional evidence it apparently developed while the case was on appeal that it did not present to the district court. We may not consider this evidence.

[33] *Cf., Wyoming v. United States DOI*, 674 F.3d 1220, 1232 (10th Cir. 2012) ("Petitioners provide no evidence of the general fund actually decreasing, nor have they shown the general fund revenues will decrease in the future . . . . Importantly, Petitioners have not shown the 2009 rules have or will result in lost revenue.").

No. 14-10049

establish standing. We, therefore, affirm the district court's dismissal of Mississippi's suit for lack of standing.[34]

## B. Agents' Standing

The Agents claim a number of different injuries. First, they allege that they are being compelled to violate their oath to uphold the laws of the United States if they follow the Directive. Second, the burden of complying with DACA is causing injury to the Agents. Finally, the Agents argue that they are threatened with employment sanctions if they do not follow the Directive.

In considering the motion to dismiss for lack of standing, we consider Plaintiffs' amended complaint and its attachments,[35] Defendants' motion to dismiss, and Plaintiffs' opposition to the motion to dismiss and its attachments.[36] Neither party objects to the court's consideration of these documents, nor do the parties contest the relevant facts.

### i. Oath Violation

The Agents assert that they have suffered an injury in fact because enforcing DACA would require them to violate their oaths to uphold the laws of the United States, specifically § 1225(b)(2)(A). In opposition, DHS argues that the violation of one's oath alone is insufficient to establish standing.

---

[34] In a letter brief filed after oral argument, Mississippi put forward three new arguments in support of its standing, based on (1) the cost of issuing driver's licenses to DACA's beneficiaries; (2) standing requirements specific to the Administrative Procedure Act; and (3) the federal government's abdication of its duties to enforce the immigration laws. Because Mississippi failed to provide evidentiary support on these arguments and failed to make these arguments in their opening brief on appeal and below, they have been waived. *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 594 (5th Cir. 2006); *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 153 (5th Cir. 2008).

[35] Plaintiffs attached the Napolitano Directive and the 2006 study conducted by the State of Mississippi.

[36] Plaintiffs attached affidavits from Plaintiff Christopher L. Crane, Plaintiff David A. Engle, Plaintiff James D. Doebler, and Plaintiff Samuel Martin.

12

No. 14-10049

Instead, the plaintiffs must allege a separate adverse consequence that will flow if they comply with DACA.

The district court agreed with DHS and held that the violation of one's oath alone is not a sufficient injury in fact to support standing. Citing to *Finch v. Mississippi State Medical Ass'n.*, 585 F.2d 765 (5th Cir. 1978), and *Donelon v. Louisiana Division Of Administrative Law*, 522 F.3d 564 (5th Cir. 2008), the district court found that the Agents are "suing to ensure that the Directive . . . compl[ies] with their opinion of what federal law requires." In other words, the agent's subjective belief that complying with the Directive will require him to violate his oath is not a cognizable injury. We agree. Under the Fifth Circuit precedent, the violation of one's oath alone is an insufficient injury to support standing.

### ii. Burden of Compliance

Next, the Agents assert that the burden of compliance with DACA qualifies as a sufficient injury to satisfy the requirements of constitutional standing. Specifically, the Agents allege that they must inevitably alter their current processes to ensure that they defer action with respect to DACA-eligible aliens. DHS argues that "a government employee responsible for carrying out an agency policy does not have standing to challenge that policy merely because of work responsibilities related to that policy." The district court again agreed with DHS and held that the burden of compliance with DACA is insufficient to satisfy the injury requirement of standing. We agree.

First, the Agents do not point to, and we have not found, any case where a plaintiff has had standing to challenge a department policy merely because it required the employees to change their practices. Second, the Agents have not alleged with any specificity how their practices will change in a substantial way. There are no factual allegations in the amended complaint describing the practices of the Agents before DACA or how those practices have changed or

13

No. 14-10049

will change.  More importantly, there are no allegations that any change which may occur will make their employment duties significantly more difficult.  The Agents have not alleged a sufficient injury in fact with respect to compliance with DACA to satisfy the requirements of constitutional standing.

### iii.  Threat of Employment Sanctions

Finally, the Agents allege that they have suffered an injury in fact by virtue of being threatened with employment sanctions if they do not comply with the terms of the Directive.  Specifically, the Agents argue that they are threatened with employment sanctions if they detain a DACA-eligible alien for a removal proceeding.  The district court found that the facts alleged in the Agents' complaint were sufficient to demonstrate that they are threatened with employment sanctions;  and these allegations were sufficient to support the Agents' claims of injury in fact to establish standing in this suit.  For the following reasons, we disagree.

As we stated above, Plaintiffs must allege an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[37] The threat of a future injury can suffice as a sufficient injury in fact, but only if it is "certainly impending."[38]  "[W]e have repeatedly reiterated that . . . '[a]llegations of *possible* future injury' [is] not sufficient."[39]

We begin with the observation that Plaintiffs have provided no evidence that any agent has been sanctioned or is threatened with employment sanctions for detaining an alien and refusing to grant deferred action under

---

[37] *Susan B. Anthony List,* 134 S. Ct. at 2341 (quoting *Lujan*, 504 U.S. at 560).

[38] *Clapper,* 133 S. Ct. at 1147 (citing *Lujan*, 504 U.S. at 565 n.2 (internal quotation marks omitted)).

[39] *Id.* (quoting *Whitmore,* 495 U.S. at 158 (internal quotation marks omitted)) (emphasis in original); *See also Lujan*, 504 U.S. at 565 n. 2.

No. 14-10049

DACA.[40]   The complaint alleges that on one occasion an agent's supervisor instructed the agent to defer action under the Directive to an alien, and the agent refused to follow the supervisor's instruction.   The agent received a non-disciplinary letter admonishing him for refusing to follow his supervisor's instruction.   This admonishment for refusing to follow a supervisor's instruction does not support Plaintiffs' claim that they are threatened with employment sanctions for failing to exercise their discretion to grant deferred action to an alien who appears to satisfy DACA's criteria.

This brings us to a fundamental flaw in the Agents' argument.   The Agents' reading of the Directive — that they are always required to grant deferred action and cannot detain an alien who may meet the Directive's criteria — is erroneous.   The Napolitano Directive makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis:

> [Our Nation's immigration laws] are not designed to be blindly enforced without consideration given to the individual circumstances of each case.
>
> ****
>
> With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE) . . . [and] who meet the above criteria, ICE . . . should immediately exercise their discretion, on an individual basis . . . .[41]

The 2014 supplemental directive, which also supplements DACA, reinforces this approach to the application of deferred action:

---

[40] In discussing the applicability of the Civil Service Reform Act, the Agents concede in their brief that "there has been no employment action taken . . . . Nor has there even been a specific threat of future employment action."   Brief of Appellants at 22, Christopher L. Crane, et al. v. Jeh Charles Johnson, et al., No. 14-10049 (5th Cir. May 16, 2014).

[41] Napolitano Directive at 2.

No. 14-10049

> Under any of the proposals outlined above, immigration officers
> will be provided specific eligibility criteria for deferred action, but
> the ultimate judgment as to whether an immigrant is granted
> deferred action will be determined on a case-by-case basis.[42]

The fact that the directives give this degree of discretion to the agent to deal with each alien on a case by case basis makes it highly unlikely that the agency would impose an employment sanction against an employee who exercises his discretion to detain an illegal alien.

The unlikelihood of an agency sanction against an agent for exercising discretion expressly granted under the directives together with the fact that no sanctions — or warning of sanctions — have been issued for that exercise persuades us that the Agents are not under a "certainly impending" threat of an adverse personnel action that is sufficiently concrete and particularized to qualify as an injury in fact that gives Plaintiffs standing.

Because the Agents have not alleged a sufficient injury in fact to satisfy the requirements of constitutional standing, we dismiss their claims for lack of subject matter jurisdiction.

## IV. CONCLUSION

Neither Mississippi nor the Agents have alleged a sufficiently concrete and particularized injury that would give Plaintiffs standing to challenge DACA. For this reason, we affirm the district court's dismissal of Plaintiffs' claims for lack of subject matter jurisdiction.[43]

AFFIRMED.

---

[42] Johnson Directive at 5.

[43] DHS cross-appealed preliminary findings made by the district court following the evidentiary hearing on Plaintiffs' petition for a preliminary injunction. Because we conclude that Plaintiffs lack standing to maintain this suit, DHS's cross-appeal is moot.

No. 14-10049

PRISCILLA R. OWEN, Circuit Judge, concurring:

I concur fully in the court's opinion and judgment. I write separately only to note that in order to establish standing with respect to some claims, it is not always necessary to present concrete evidence that an injury has occurred or will, beyond question, occur, as the Supreme Court implicitly recognized in *Watt v. Energy Action Educational Foundation*.[1] The State of Mississippi has not, however, made any arguments of this nature.

---

[1] 454 U.S. 151, 160-61 (1981).